All right, so Ms. King, you have reserved three minutes for rebuttal. I believe, is that right? That's correct, Your Honor. Okay, you may proceed. May it please the Court, Karen King, I represent the appellant, Yasmin Karimi, in this case. She is the mother of this hate convention matter. This case has many unique facts. Both parents are foreign nationals. They're Ukrainian. Neither of them lives in Ukraine. And after the Russian invasion, both agreed that their children should not be in Ukraine. Neither parent wants the children back in Ukraine. Aside from that, the family history here is extremely long, messy, complex, and extremely ugly in terms of the accusations on both sides. There's been a custody battle that's been raging, started well before the events of this particular case, and they continue to this day. There's a Ukrainian family court proceeding that's now on appeal. I guess the issue is what did Judge Cote do wrong? So the threshold issue here is whether or not this is even a hate convention case at all. Actually, let me just backtrack for a second. You said the proceedings are continuing, custody proceedings are continuing in Ukraine. I reviewed the very lengthy decision of the Odessa District Court and understand that appeal has been filed. Has anything happened in that appeal? The appeal is ongoing. The documents have been submitted on the appeal. I don't believe that there's been an argument yet. So no decision. Do we know if those courts are functioning right now? There is a court. I don't know beyond that. And there's been a dispute over whether or not the courts are fully. So we have the guardianship decision in favor of Mr. Tereschenko and the district court decision in favor of awarding custody to Mr. Tereschenko. There was the guardianship decision in May of 2019. That is a decision where the mother was not a participant and there was no exploration as to why. But she was a participant, though, and presented witnesses in the Odessa court proceeding, correct? She was a participant in the Odessa court proceeding. There are issues on appeal, including evidentiary issues and her ability to present certain arguments to that court. There was also an issue about whether or not there was some corruption with a particular judge in that court, which was excluded by the district court below but is relevant for purposes of the appeal. But back to Judge Sullivan's question, I think the threshold one is still whether or not this is a hate convention case at all, whether or not it should have been in the federal courts to get involved in this longstanding custody dispute. And on this issue, we characterize it as subject matter jurisdiction. Whether you frame it that way or not, the issue is whether or not a prima facie case even exists to raise a hate convention claim. The hate convention requires a wrongful removal or retention. But for jurisdiction, all you need is a removal. You don't have to show the wrongfulness, right? You have a removal where or retention. Well, there are decisions, including the First Circuit and some district court cases, which say that if you don't have the prima facie case, that is a subject matter jurisdiction problem and the prima facie case requires wrongful removal or retention. But that's not what the statute says, right? It just says arising under the convention. I guess that begs the question of whether it rises under the convention if there's no wrongful removal. But in any event, at this stage of the case where there has been evidentiary proceedings and we do know what the testimony and facts are, the wrongful removal piece of it, I think, is not there. The father himself admitted on testimony that there were no conditions to the removal, notwithstanding what the lawyers had been arguing in the court papers, and that the agreement between the parties to remove the children from Ukraine was not conditioned. It was indefinite. There was no expectation of return. But he expected the children to come to Abu Dhabi, right? Yes. He did say that he wanted the children to go to Dubai, and Ms. Karimi says that she did not want to go to a Muslim country with two young children. You're saying that he consented to her taking the children and never contacting him again. No, no, no. That's not what I'm saying. They agreed to remove the children from the Ukraine. After that point, they agreed to discuss where they would permanently reside, and the continual disagreements over where that could be happened after the removal. But she didn't tell him where she was with the children. Well, there is a dispute about that. I agree that by the time we reach the United States, there's a communication issue. But after removal of the children— Didn't he have to have an interpol? He did in August of— And did he have to leave the State Department? Yes. He did in August 2022. This is when the U.S. comes into play. But after the removal of the children with consent, with agreement, in March of 2022, she goes to Poland. She says that they were in contact in Poland. Then she goes to Holland, where she has family, where he's been before, and they have contact with the family. And he knows where the children are. And then they're in Spain. He knows where the children are. He's in contact with the children. They're discussing vacationing together in Spain. Something happens between the parties in Spain. There is a disagreement. And, yes, at that point, there is a departure. Are these facts established—alleged or established in the district court record? I'm sorry? The facts that you're describing right now— Ms. Karimi did have that in her testimony before the district court. It's done by affidavit. So it's in her affidavit. There is an attempt to cross-examine him on this point because he denied it. And there was a reference to telephone records and transcripts. And it got cut off because of the 90-minute restriction on the cross-examination. I mean, to me, what you're arguing now is I don't view this as a subject matter jurisdiction because you're making arguments about sort of consent and what their understanding was. And, you know, to me, that is beyond saying, like, well, yes, there's been a sufficient allegation of a wrongful removal or wrongful retention. And what you're talking about now really seems to go to your argument that there was the merits of this case and that there's consent. So whether we want to talk about it as subject matter jurisdiction or the merits, there's no prima facie case is our fundamental argument, that there is no wrongful removal or wrongful retention. Removal goes to the agreement and Ukrainian emergency law. Retention goes to the fact that this was never about temporary removal and return back to the country of habitual residence. If we get into the Hague and get into the defenses— I see my time is almost up, but primarily the one-year and settle defense was a critical piece of this, and we acknowledge that there's a forfeiture issue here. But given that one year and settle, the case law is murky, the district court itself got the case law wrong on how the standard operates. This defense is there to protect children, to make sure children are not used in ways of gamesmanship between the parties. Do you agree that if you had been able to induce evidence as to the settled, when you're in settled defense, the district court then would have had discretion to determine whether to return and whether to abide by the Ukrainian district court order? Yes, I agree that if she had been allowed to present evidence of settlement, the district court nonetheless would still have discretion to return the children, but that evidence was never presented and never considered. There's no obligation. It doesn't end the case that if you want to consider the one-year and settle defense, there would need to be a remand to consider that evidence, which we think is quite important. And then I see my time is up, but we do want to touch on the grave risk. There are a lot of issues here, so I think we should continue. Thank you, Your Honor. In addition to the one-year and settle defense, we think that the facts going to one-year and settled are quite clear, and the district court itself found that departure was on March 2nd. The petition was not filed until March 8th of the following year, and the father himself testified that he expected the children on March 1st. So we think that on all fronts there was a one-year mark that had started running. In terms of grave risk. Is it clear that it runs from the date of wrongful retention rather than the arrival? Yes. It is clear that it begins on the date of unlawful removal or retention, which here is March 2nd, and the Lozano Supreme Court case, I think, makes very clear that that clock is. Well, I know it can't be equitably told, but I wondered whether there was anything further. I think it is now settled that it begins on the date of removal or retention. Isn't your argument, though, partly that it wasn't a wrongful removal at the point of when they left, that there was consent to leave, and so on? How are you marking that as the point of the wrongfulness versus the point which became clear that the children weren't going to be returned or he wasn't going to know where they were or what have you? Why are you marking it from when? Well, it's an alternative argument. We don't think this is a hate convention case at all because there was no wrongful removal or retention. But if there's a finding— Right. You're saying that we think this is a hate convention case. Right. How is that the date they left? If you think this is a hate convention case, then we are already in the territory of she did something wrong by taking the children out of Ukraine. No. She did something wrong by taking the children without the husband's knowledge or permission to the United States. Right. Well, that happens far down the path of this timeline, right? So in terms of the one-year unsettled defense, that would be relevant, wouldn't it? No, because we're not talking about removal to the United States. The removal happens when they left the country of habitual residence. Retention. What about retention? Retention, although in common parlance we agree that retention evokes notions of access, under the hate convention it is all about the country of habitual residence and whether or not you were retaining the children outside of the country of habitual residence. It's about returning from a temporary removal that was with consent of the other party. So this is just not a retention case at all because this is not about temporary removal for a vacation and not coming back. I don't understand that. This was a temporary removal insofar as the war conditions required their departure from the country, and both parents agreed to that. He had a decree awarding him custody, and according to his allegations, he was denied access to the children, even to know their whereabouts, over a period of months. So after having produced the travel documents to allow them to escape danger, it took a while for it to become apparent that he was not going to be told where the children are, according to his allegations, and that they ended up in the United States. And so I read this as wrongful retention. It was consented to removal, but it was wrongful retention that became clear as time passed. And then at the point where the retention was apparent, he took every measure he could to find them and then recover them in a timely way. I understand that given the constraints of the process below that the narrative has been developed by the father, and so I understand why there's that impression. The reason why it's not a retention case is because under the Hague Convention, a retention is when one parent is given permission to leave temporarily and never returns to the country of habitual residence, and that's not this particular situation. Why is the country of ‑‑ I mean, this is an unusual situation for many respects, but I'm not sure that the notion of retention is also so securely anchored in the country of habitual residence. Well, the entire convention speaks to the country of habitual residence as the primary, you know, purpose of protecting the children from unlawful removal or retention. Right, I understand that. Even the conventions, you know, the Perez-Vera report that ‑‑ there could be no wrongful retention actionable under the Hague unless she had failed to bring the child back, the children back to the Ukraine. No, I'm arguing that disputes over access, just because the parents are in different countries, does not automatically make it a Hague Convention case, that the Hague Convention is narrowly designed to protect children from being wrongfully removed out of their country of habitual residence or retained outside of the country of habitual residence when children ought to be secure and in their stable environment in their home country. Did she deny him access, even though he had the award of custody by the country? She did not deny him access, that this was emergency circumstances, of course. You're saying he knew where he was? Yes. She told him where he was every step of the way, he knew they were coming to the U.S.? Not the U.S., I agree on the U.S. He knew where she was? In the Ukraine, there's a dispute over whether he knew ‑‑ After the November taking? There is a dispute about their custodial rights. There's a dispute about everything in this case, but in terms of after removal in Poland, her testimony is that he was in contact with the children. Then she goes to Holland, where she has family, he was in contact with the children. And then she was in Spain, and he was in contact with the children and was planning to come there for vacation. So these parties ‑‑ So there was no need for the Interpol notice and the yellow warning and the State Department contact, all of that was ‑‑ Right. They have a fight in August, and I agree, it's not disputed, she took that she applied for refugee status in the United States and did not tell him. And at that point, you're correct, he did not have access. And my only ‑‑ we're not here to defend the actions or the morality of anything, it's purely about whether or not that particular set of facts creates a hate convention case. So your view is because he consented to allow her to take the children out of Ukraine, he has therefore given up any ability to bring a hate convention case. That's really what you're saying, right? He has the ability ‑‑ a hate convention case would require, yes, under these facts, he cannot bring a hate convention case having agreed to the removal of the children from the Ukraine indefinitely with no plans for return. He has custodial rights. Does that mean he can't move on his part and he will never really going to be able to see his children? He has custodial rights to be sure, and he's pursuing that in multiple jurisdictions, and in the Ukraine he has this order. And once that order is finalized, if there's still a dispute ‑‑ But why would that ‑‑ I guess your client initially said she was going to abide by a Ukrainian court ruling. Absolutely, Your Honor. Both parties agreed to abide by the Ukrainian court order. I don't think the comment by her lawyer, this is the first appearance before the district court after three hours on the case, I don't think his comment meant that she would give up all of her appellate rights. And I don't think he would have agreed to that either. The point is, once the Ukrainian court, the custody court, family court, who's supposed to be dealing with these complex matters with time and with evidence, once they issue that decision, the parties do have to comply with that. And if there's any problem with enforcement at that point, there are remedies. The UCCJEA provides remedies. That's the state courts in the United States that would deal with enforcement of a foreign custody order. But what happened here is the federal court took it upon itself to try to anticipate what was going to happen there and essentially awarded the father custody of the children and decided to uproot two children from their environment in New York without consideration of their settlement and send them to France, to which they have no contact. Without consideration? You're saying the court didn't consider that issue? I'm sorry, which ‑‑ No, no. Nobody has argued that the United States is the country of habitual residence. We all agree that the country of habitual residence is Ukraine and nobody wants the children to actually go back to the country of habitual residence. The United States is relevant because there's settlement. Well, the district court found that they could go back to the Ukraine, right? Right. Well, we definitely disagree with that. We think that the grave risk finding here was analysis here was cursory and that there was sufficient evidence in the record that both parties said that it was too dangerous all over the country. So how the district court managed to not find that there's a grave risk we don't agree with and then take that to jump off and say, therefore, we can go to France, to which the children have no ties at all, the furthest thing from a country of habitual residence. Well, did they have any more ties to France than they had to the United States on the day they got here? Not on the day they came here, although the younger child was born in Florida and has U.S. citizenship and the parties, you know, met in, I don't know if they met, but they spent time in Florida, which is how the second child ended up being born here and having U.S. citizenship. Again, the United States is not the country of habitual residence, but when children are in a place for a lengthy period of time, over one year after removal or retention, that is an issue that should be considered because the whole defense and the whole convention is meant to protect children. And although the mother was at a disadvantage, there were strategic, there were missed opportunities and missed points here, ultimately the process and the district court's decision has to protect the children, and that's why we're asking you to take a close look at this. What's the status now? The parties are discussing the transfer of the children, as was ordered by the district court before the state, the temporary stay was issued. So the children are still here in the United States? The children are currently here in the United States. The father, I believe, is planning to come within two weeks. Between, I guess, going back to Ukraine and going back to France, your view is where should they go? Well, I don't think children can be sent to a place that poses a grave risk to them, so of course that's a no-brainer. All right, but then I guess we should be talking then about why. So your view is that Judge Coates' decision that the exceptions under Article 13 don't apply is a no-brainer error, and so tell me why she lacked a brain here. Well, I did not mean that. Well, that's what you said. Your choice of words. Just answer the question. Ukraine is in a state of war invaded by a huge nuclear superpower. The judge didn't know that, was unaware of that, you think? Well, I think the judge thought that it was proper to send the children to France, and in order to do so said that it wasn't necessary to, that in any event it wasn't relevant anymore. My question, the judge rejected the argument that an exception under Article 13 applied, correct? Correct. Okay, and so concluded that there were parts of Ukraine that were safe, right? She did conclude that, yes. Okay, and so why is that wrong? Just because you and your adversary would rather the kids not go back? No, because the only evidence in the record on that was a statement from the father saying that, well, he could go to leave. I don't know if I'm pronouncing that correctly. There was no evidence presented on the relative safety of leave versus the rest of the country in the Ukraine. And when I said that it was a no-brainer, it was because you had given me the option between France and Ukraine and given the state of war in the Ukraine, I think it is a no-brainer that between those two choices, obviously France would be safer for the children. Okay, but what is the basis for saying that the other parts of Ukraine are, that all of Ukraine is unsafe for the children, contrary to what the judge found? We presented news reporting and talked about the widespread, I mean, as Your Honor referenced itself, like this is not unknown that Russia has invaded Ukraine, that there were bombs throughout the country, there were U.S. government reports, the U.S. State Department has issued warnings, and both parties, again, don't disagree about that. So in your view, assuming that this is a case in which the convention applies, and assuming that the court correctly found that Ukraine is a country of habitual residents and no exceptions apply, is your view that the court nonetheless has authority in those circumstances to send a child or children to a third country? I'm sorry. I just want to make sure I understand this. So if the Hague Convention applies, no exceptions exist. Right. Ukraine is a country of habitual residents. No exceptions about grave risk or anything else apply under Article 13. And so is a court nonetheless free to say, well, I'm going to send you to a different country? No, because the country of habitual residence is available, and the convention requires that the children be sent to the country of habitual residence. That's in the preamble of the convention. All right. And so if that's the case, then. Excuse me just a second, if I could. Sure. So the Article 1 says the objects of the present convention are to secure the prompt return of children wrongfully removed or retained. Yes. It doesn't say return to the country of habitual residence. Right. Country of habitual residence is in the preamble of the convention. It is not in Article 1. Yes, but the State Department and the commentary on the development of the Hague Convention contemplated instances where it might not make sense to acknowledge that technically it doesn't require return to the country of habitual residence. I acknowledge that the supporting authority has made reference to the potential to send a child to a third country if certain preconditions exist, if that is what is consistent with preserving the status quo ex ante. So that would be a pretty unique circumstance where the primary caregiver, for example, or the family had already decided to move or something like that. None of those situations exist here. And we don't think the text of the convention itself. We could debate that, but it's true, right? The State Department commented. It is true. Right. It doesn't say status quo ante. It just says in the State Department the petitioner has moved from the child's state of habitual residence. The child will be returned to the petitioner, not the state of habitual residence. Right. And I think in that context we're talking about the primary caregiver. But again, here we have, you know, it may not be definitive because the appeal isn't resolved, but two authorities in Odessa or in Ukraine have awarded custody to the petitioner. They awarded custody to the father in Ukraine, not a specific address in Ukraine. And it was not discussed whether or not France or the U.S. or other options might exist because that was not presented to the court, which is one of the issues with the Odessa decision. But in terms of the primary caregiver parent in residence. I don't think primary caregiver has been decided by that court or by the district court below. I know that there are references to the fact that the children lived with the father and the grandmother. They're heavily disputed facts. Nannies are involved on both sides of this, and the children are alleged to have been left alone with various people. Both of the Ukraine authorities awarded primary custody to the father. They did in the more recent decisions, and the mother was not a participant in the first one. Was there, they did in both decisions. They did in the guardianship, I'm sorry, the guardianship authority and the Odessa decision. The party's custody agreement had the children living with the mother. I'm talking about court authorities. Yes. And there are only two of those, and they both awarded custody to the father. Yes. Thank you. But the district court's order, which directs that the children go to France with the father, is pretty open-ended. It doesn't set any limits on whether they're waiting for the cessation of hostilities in Ukraine, or whether they are to be there subject to the orders of a Ukrainian court. Am I wrong about that? No, you're right that the district court simply grants the petition to an ordered return to the father in France. That sort of feels like a custody order. Absolutely, Your Honor. That's our main issue with that. All right. Well, you have a couple of minutes to respond. Thank you, Your Honor. We'll hear from Mr. Benuchis. Am I saying that right? Yes, that's correct, Your Honor. May it please the court, my name is Michael Benuchis. My colleagues and I represent the appellee Roman Tereschenko. The Hague Convention was intended to discourage and remedy unilateral abduction of children by one parent, precisely the actions Ms. Karimi took in this case. Ms. Karimi removed the children from Ukraine in and around March 2022 and secreted them through several countries in Europe for ultimately bringing them to the U.S. She removed the children from Ukraine with permission, right? On consent. Yes. Okay, and so the issue then is what were the conditions, if any, on where she should go and where and for how long and what the relationship would be with the husband. Absolutely. Ex-husband. So the district court found that his consent was limited in scope, and I think the operative framing here is did Mr. Tereschenko give Ms. Karimi the right, unilaterally move anywhere in the world with the children and conceal them from him, which he most certainly did not, and those were the actions that she took. But opposing counsel says that it's disputed whether she concealed them from him. Well, so it's interesting. So it seems like they now concede that the wrongful retention occurred when the children were brought to the United States, which would lead naturally to Well, not that. Well, to the extent that there was any concealing of the children, that happened in the United States, and that would naturally lead to the one-year well-settled argument later, which is when the clock would start to run. So that wouldn't start to run until July when she came here? If Mr. Tereschenko, sorry, Your Honor, if Mr. Tereschenko had consented to the children traveling through Europe, which was contested and which was not a fine, the district court made findings on all these issues. So assuming arguendo here, that Mr. Tereschenko had consented to permit Ms. Karimi to travel throughout Europe, and then once she decided she wanted to go to the United States, she cut off contact, that would be the date of wrongful retention, which the district court did not directly say in the decision, but more or less hinted at, if you read what Judge Kodak had reported. But according to your account, she took them and then cut off communication altogether. Yes. And so why at that point would the one-year begin to run? So the district court found that the date of wrongful removal and retention happened when she left Ukraine on March 2nd, and if that were the case, that would be the date of wrongful removal and retention. So why wouldn't it have been error for the district court to exclude evidence of the now-settled, relinked to the now-settled defense? So, well, first, Ms. Karimi never disclosed or gave notice that she intended to raise that defense. When pretrial exhibits were exchanged, counsel looked at them and we realized that she was going to mount the defense. There would be no other reason for her to have certain exhibits there. That prompted us to file a motion in limine. When she opposed that motion in limine, that was the first time that there was any formal notice that she had intended to raise that defense. Judge Cote had initially excluded the defense based on the fact that it was not in the answer and it was raised less than two weeks before trial were set to begin, therefore prejudicing Mr. Tereschenko. Notwithstanding, even if it were available to her, pursuant to Article 18 of the Hague Convention, the judge would not have to consider the well-settled defense, even if it were established. It doesn't, I think the district court would have to consider it. It wouldn't be bound by it. That's correct. So it can consider it, and even if it were proven, the judge would not be bound to dismiss the petition on that basis. So would it be appropriate ever for the district court to say, yes, even if I were to consider the evidence, I know that I would always exercise my discretion in this way without having even considered whether they are factually settled? Sure. So I think it would in certain circumstances, and certainly in a case like this where there's a very clear-cut abduction and the actions taken by Ms. Karimi here, one of the purposes, there's multiple purposes of the Hague Convention. One of them is to prevent unilateral cross-border movement of children over a left-behind parent's consent. What Ms. Karimi did here is the exact type of conduct that the Hague Convention seeks to prevent from happening. So when a court is weighing balances, it may say the conduct here by the respondent is so egregious that despite the fact that children may be well settled, I'm still going to return them to the petitioning parent. So you think she had no obligation, even if the dates were very close, and given the expeditious nature of the proceedings, she didn't have to consider with the children? Absolutely. I mean, at best, we're looking at a one-year and six-day timeframe here between the date of wrongful removal slash retention and the filing of the petition. So moving on, just again to get to one of the arguments here that I heard. I'm sorry. So your view would be that the wrongful retention occurred at what point? The district court found that the wrongful removal and retention occurred on March 2. Right, we know that. What's your point? What would be your argument? What would be your argument? I would agree with the district court there, based on the findings of the court. Because the district court did not find that Ms. Karimi and Mr. Tereschenko were in contact, and he had consented to her traveling all throughout Europe. So based on the record, I'd have to agree with the district court on that date. All right, thank you. So she removed the children without consent because she didn't abide by the stated terms of the consent? Well, I would say she removed the children with limited consent. Clearly, there was an emergency situation, so Mr. Tereschenko, as a concerned parent, said, yes, of course, get the children out of Ukraine. He had testified that she had agreed to bring them to him in Dubai. I thought the testimony was that he requested. Well, he testified that she had agreed. The district court found that he had asked, and the district court also found that the scope was limited. I think the operative, again, operative consent that he gave was framed as, did he give Ms. Karimi the consent to surreptitiously move the children to the United States, cut off all contact, and not tell him where they were, and most certainly he did not do so. Moving on to the conditional consent, Ms. Karimi's own actions here belie her argument that she had any sort of blank consent here. I mean, a person who is under the impression that they were given consent to unilaterally relocate the children would not have taken steps to conceal them in the United States. As the court noted, not only did Mr. Tereschenko contact Interpol, and the international authorities, he was only able to locate the children in the United States with the help of the U.S. State Department. After they were located, the children came in July 2022, and he, seven months later when he found that they were in the U.S., he filed his petition. When we found her in the United States, Ms. Karimi still dodged service. So all of those actions would indicate that she understood that she did not have Mr. Tereschenko's consent to move. Moving to the third country return. Well, could you address the district court's findings on grave risk? Yeah, I think you've got to get there first. Sure, on grave risk. So first, Ms. Karimi had the burden of proof, but aside from that, the Supreme Court in Sadovyi Golan has said that courts should ordinarily look at, or they have the discretion to look at immutative measures that are presented by the parties. Here, Mr. Tereschenko had offered to move to Western Ukraine. The district court found that sufficient to ameliorate the harm. Further, also going back to Sadovyi Golan, the Supreme Court had said that there are going to be some natural situations where it would make sense for the court to explore ameliorative measures. For example, the example that they gave was an epidemic raging in one part of the country. Naturally, you could return the children to a different part of the country to ameliorate the harm and not send them back into the zone of danger. So that is what the court found here. Well, I guess, but then didn't act on it here, right? So in other words, the district court found that there was no grave risk to return them to the country of habitual residence, right? Correct. And then turned around and said, but I'm going to send them someplace else anyway. Well, I believe that was a practical consideration. But how could it be? I mean, so the court is allowed to do practical considerations even when there's no grave risk to returning the child to the country of residual residence? I think just, again, as a practical consideration, Mr. Tereschenko was in France. Given the discrete circumstances of this case, it was appropriate to send the children to Mr. Tereschenko in France rather than Ukraine. As the district court noted, due to the laws in Ukraine at the time, Mr. Tereschenko could have legally just— So it doesn't pose a grave risk, but it's what? Just getting back to what the district court had noted, even if they would have—even if she would have returned the children to Mr. Tereschenko in Ukraine, he would have been free to cross the border into France if he so chose to. So there, I think the court sought to avoid ping-ponging the children around Europe as just a practical consideration. I mean, I guess, does a court get to do that under the Hague Convention? Yes. Does the court get to say, you know, Mexico is nice. I'll send the kids there. Well, I think that goes to the fact that a court does not have discretion as to whether to return a child once a petitioner proves their prima facie case and an exception is not raised. At that point, the district court was faced with essentially three options. Deny the petition. There was no basis, legal basis for which it to do so. Send the children to France or send them to Ukraine. When the options of sending them to France or Ukraine were before the court, the court in its discretion chose, given the discrete circumstances of the case, to send them to France, namely because Mr. Tereschenko was there. Well, why not Dubai? If he wants to go to Dubai, why not just say you can take them back to Dubai? Did Judge Cote have the authority to do that? If he were in Dubai, yes, she would. And, I mean, there's no limitation on the judge's order. There is no limitation. She should basically have made a custody decision that Mr. Tereschenko is the parent who should have custody and he gets to take them to France so he can live the rest of his life. I would respectfully disagree with that characterization of the order because Okay, show me where in the order there's a limitation, temporal or otherwise. The order does not say that Mr. Tereschenko is permitted to live in France with the children in perpetuity. The Hague Convention is a stopgap measure. So the abduction was ended by the court by returning the children to Mr. Tereschenko. And now, again, there's an ongoing custody litigation in Ukraine going on in the background. So it's the extent that either of the parties have an issue with where the children live, including Ms. Grimish. If she does not want them to live in France, her recourse is in the courts of Ukraine not to engage in self-help. So you're saying Judge Cote could have said stay here until the cessation of wars but let the Ukrainian family courts work this out. She could have done that too? Well, because the operative remedy is return. Return? Your view is that the operative remedy is return to the petitioner. Return to the habitual residence or the petitioner based on the circumstances of the case. Well, I mean, certainly the treaty doesn't say anything about return to the petitioner. It talks about return to the country of habitual residence in the preamble. Then it just uses the word return without an object. So in Article I and Article XII, the text of the convention refers to return. Return to the habitual residence only occurs in the preamble. However, and that gets to what the court previously stated about the Perez-Vera report and the State Department's commentary, which both established that third country return is possible. And then the Ninth Circuit in Von Kennel-Gauden v. Remis essentially went through the same analysis that the district court did in this circumstance and said that third country return was available to a petitioner. In that case, it did not do it because the case was mooted out. What Your Honor had just said, you know, return to, let's say, let them stay in the United States. In the Von Kennel-Gauden case, the petitioning parent had moved back to the United States, to Hawaii. And essentially, the return would have been to that parent in the United States. Therefore, the court said that the case was mooted out. So that's why that's- There was some sense of discussion about circumstances in which the return had to be focused on the petitioner rather than the country of habitual residence. In that particular instance, yes. But it does seem that there's some tension between a court concluding that the country of habitual residence is available, doesn't pose a grave risk, but I'm not going to send the kid there anyway. I'm going to send the kid someplace else. I would agree that there is tension there, but I would not then say that that is reversible error. Essentially, the court exercises discretion between Ukraine and France. Given the particular circumstances of the case, the court chose France. But I do not believe that that would rise to reversible error. The court made some sort of egregious mistake in doing so. Does the fact of the Ukraine, the Odessa District Court judgment, awarding custody to Mr. Tereschenko play into the calculus at all? Not particularly. I think that a lot of the arguments made by Ms. Karimi about the underlying litigation is more or less a red herring. The relevant custody right that was breached by Ms. Karimi was Mr. Tereschenko's right to know where or decide where his children live. That right was- That's under the Ukrainian family code? Under the Ukrainian family code, exactly.  And no matter what, whether they were operating under the initial custody agreement or the guardianship body ruling or the court order, that right was still in place and that right was most certainly violated by her actions. But she has that right, too, then, right? That's for both parents. Yes, but a parent does not have the right to self-help. That's the issue here. Your recourse as a parent is to go to court and ask to relocate, not to take it upon yourself to do so. So the order that the district court entered, though, allows Mr. Tereschenko to remove the children to a UAE country that's not party to the hate convention, right? No. She does not- There was no rights conferred to Mr. Tereschenko by the order other than returning the children to him. That's the only right. It's not like he has an enforceable order that he can- Well, you just said that he could have had the children returned to him in Ukraine, but no, we are not doing that. We're going to France, and there are no limitations on the district court order. Well, that would be based upon where he was, where he was seeking to have the children returned to. And I think that- But what precludes him from moving them to the UAE? What precludes him? Again, I'd go back and say that there's an ongoing custody dispute. The children are subject to a custody litigation in Ukraine. Right, and that custody dispute is going to prevent him from going to the UAE? Well, there would be recourse. There would be- That the Ukrainian court could issue custody orders to place the children with either parent or any country as they saw fit. That's what the purpose of the custody court is. It's not clear that it would be enforceable, right? Isn't that the concern? That would be an issue of foreign law, which I am not equipped to- Well, is there any case in which a court has concluded that there was a wrongful removal, there is a country of habitual residence, and determines there's no exceptions that would require something other than a return to the country of habitual residence, but has nonetheless said, we're going to go with a third country? Well, there's some U.S. case law and some U.K. case law, which we cited in our brief, including von Kennel-Gordon, which says that that is viable. Again, I don't think that this court needs to make any sort of sweeping decision over when it is available or when it's not. Just in these particular circumstances before it, that it was appropriate for the court to do it in this instance. All right, but if it turns- I mean, if the court had concluded that, yeah, there are grave risks to go back to Ukraine at Article 13, what would the consequences of that be? That the kids would stay here? Well, the court would still have the authority under Article 18 to grant the petition despite that finding. So the court could have found a grave risk and then still grant the petition. The court could have feasibly said, it would be a grave risk to go to Ukraine. However, that issue is moot because I'm sending the children to France due to the specific circumstances of this particular case. However, the court did not do so in that hypothetical situation. But there's no obligation that the children stay in France, even for the pendency of the Ukrainian custody suit, right? There's no- no. Well, the district court's order does not give any credence or it does not give any ability for Mr. Tereschenko to go anywhere in the world. All it does is return the children. After the children are in France, they're subject to an ongoing custody proceeding. So, I mean, in theory, parents could move the children around. However, the Ukrainian court would issue- in theory, would be able to issue court orders preventing a parent from doing so if it violated a court order or if the court found that that was not in the children's best interest. Do you think the Ukrainian court could issue a court order that bars Mr. Tereschenko from moving the children from France? That would be an issue of foreign law, which, again, I'm not equipped to answer to this court. However, I do understand that, you know, there are generally- foreign orders are enforceable in different jurisdictions based on local rules about enforceability. So, is it within the realm of possibility? Yes, although I am certainly no authority on that area, Judge. It's just this whole thing feels like what it's not supposed to be, which is a custody dispute. U.S. courts, especially U.S. district courts, generally don't function as family court judges, and so they don't make custody decisions. The treaty itself and the State Department guidance makes clear that this is not a custody determination. But Judge Coates' order basically just says the kids go back to the father in France. So, at the base of every Hague Convention case is a custody dispute. So, inevitably, when a court issues a ruling either to grant or deny a petition, there's going to be some sort of movement of children. That could be construed as a custody order if it had some sort of long-lasting effect. However, again, the orders here are stopgap short-term measures. Let's end this wrongful retention of the child, return the child back, in this case, to the primary caregiver, and let the Ukrainian courts do their thing. So, that would be what, in this instance, what the order actually affected in a practical way, because it did not grant Mr. Tereschenko any rights other than you have the ability to take these children back to France. After that, the court has no jurisdiction or authority to tell anybody what to do with where the children live. Again, if the Ukrainian court disagrees that they should live in France, that Ms. Karimi has her recourse there. However, she cannot resort to, should not resort to self-help to do so. And do you agree that actually there would be a grave risk to the children to order them returned to Ukraine? No. No. So, Mr. Tereschenko had offered to bring the children to western Ukraine, and the district court found that that ameliorated the harm, and we agree with the district court. So, no grave risk? No grave risk, and as a greater point, it was mooted out by the return to France. That issue was mooted by the return to France. Well, maybe, maybe not. But I guess here's another question I have. This may be more of a hypothetical. But if Ms. Karimi said, I will take the children back to Ukraine, the district court would be free to say, Well, Mr. Tereschenko had offered and would go to Ukraine if directed. So, if the three of them, if the two parents and the district court had said, yeah, we'll bring them back to Ukraine, there would be no preclusion from the court doing that. And I think that didn't answer your question. Let's assume this is a, let's make this a pure hypothetical. It's just France. It's two French citizens. And there's a wrongful removal to the United States, and the court says, you've got to go back to France. That's the country of habitual residence. And so, the parent who removed the kids to the United States says, okay, I'll go. I will take them back to France, and we'll duke this out in the family courts of France. Does the federal district court have the authority to say, nonetheless, I want these children with the other parent? I think that would be, in France? Yeah. So, that happens. You've got to go back to France. That's the country of habitual residence. But in the interim, I'm going to make a custody decision, letting the kids go to the other parents, and you can all duke this out in France. So, yes, depending on the circumstances of the case. Let's say, for example, the abducting parent had hid the children from the petitioning parent. In that case, sometimes district courts will effectuate return orders where the petitioning parent will retrieve the children and bring them back. However, again, once the child is back in France in your hypothetical, the French custody court would have jurisdiction. And if the French custody court did not believe that that was appropriate or in their best interest, they would be free to issue orders to that effect. But the short answer is yes. So, that's why I'm also confused. You said the Ukraine order awarding custody to Mr. Tereschenko is of no moment here. Well, I think it's of no moment, because regardless of whatever the legal wranglings are in Ukraine, the custody right which was breached was conferred by the Ukrainian family law. And that was the right of custody which was breached by Ms. Kramy's conduct, which is the wrongful action here. But it seems to, insofar as this starts to look like a custody battle between citizens of a country of habitual residents that is remote from here, it seemed to be important that the actual courts charged with making custody determinations had awarded custody, albeit in a non-final order because an appeal is pending. They had awarded him so that he had legitimate rights as a petitioner here under the Hague Convention. Sure. So, in that respect, yes, it does. And the court obviously considered the fact that multiple courts had awarded Mr. Tereschenko custody of the children. So the court did note that. However, I do not believe that that discrete fact materially affected the outcome of the petition. Even if it had not, so long as the right to decide where the children live were breached by Ms. Kramy, he would still be available to get relief under the Hague Convention. Although, in terms of context and the fact that he was the primary caretaker of the children, that is certainly important. Again, so Ms. Kramy has argued that third country return, to the extent that it's ever appropriate, would only be appropriate when it's to the primary caregiving parent. One, I would say the record, the judge had found that the children had been living with him since, I believe, 2019, and multiple courts had awarded him custody. Therefore, he was the primary caregiver. Further, I would just argue on the legal aspect that that would be imposing an atextual requirement on the Hague Convention, which the Supreme Court in Golan v. Sada had said is inappropriate. So if the court doesn't have any other questions, I'd ask that they affirm the decision. Thank you. We'll hear from Ms. Kane for three minutes. Thank you. Let me just begin with the point about the custody orders. To clarify, one is an agency determination and one is a court order. Neither of them are final or binding. And I think we agree about that, and I agree with Mr. Banukas, that it is a bit of a red herring. That proceeding continues. And while that proceeding- It wouldn't have been final if it weren't appealed, right? It is appealed. The court order is appealed. The agency decision- Had it not been appealed, it would have been a final. Had it not been appealed, it would have been final. Correct, Your Honor. It was a lengthy order. There were lengthy proceedings. Your client had a chance to present witnesses and so on, right? Yes, and has many problems with the proceeding and is appealing it, of course. But it is a red herring because, as Mr. Banukas said, the Hague Convention is meant to be a stopgap, I think is what he said, measure. It's meant to determine where the children should be while the custodial proceedings and while the family court is deciding these very important custodial issues. That is the sole purpose of the Hague Convention, which is why, in normal cases, it's all about sending the children back to the country of habitual residence because that is where the proceedings are happening. That is where their home is. But in this case, what the district court has done is not thought about it as just the physical location of the children while custody proceedings are ongoing and decided. What the district court has done is imposed a view as to what the final outcome would be and executed that outcome. Or has enforced a foreign court's judgment, which is not the subject of the Hague Convention either. Enforced a non-final order or judgment, yes. Even if it were final, that wouldn't be a Hague Convention case. Correct, if that were the sole claim, I guess, under the Hague Convention. Okay, but if the thing becomes final, or if it became final yesterday, right, you lost your appeal. Yes. Would that make any difference in how this case is adjudicated? It couldn't have been brought as a Hague Convention case. I think it would have been brought in this U.S. state court, in the New York state court, for enforcement under the UCCJEA, assuming that there was no compliance. But, I mean, say you have, everybody dukes it out in the courts of Ukraine, and then the losing parent, after a final order, bolts. Obviously, that would still be a Hague Convention case, right? The person would come back, the children would get returned back to Ukraine, and then the court there would make quick work of who's getting custody and where the children are going to reside. If there's a final order, and the parties are not already in the country, is that the hypothetical here? I'm just saying that the Hague Convention is not designed to have district courts in the United States effectuating orders of family courts in other countries. Correct, absolutely. It's just to remove them back to a country of habitual residents, so the courts there can work it out. And if they've already issued a final order, then they'll issue another one, and maybe hold somebody in contempt. Yes, whether or not that proceeding is final or not doesn't affect whether or not the district court ought to be enforcing anything. Does the fact that the children are not in Ukraine affect the ability of the Ukrainian courts to resolve the custody? No, it does not. Well, I mean, frequently that is the case. I mean, frequently courts want to see the children. They want to talk to the children. That's a big piece of family law. It's not an issue, at least in this case, that the Ukrainian court is able to continue to adjudicate the very complicated and longstanding custody battle between these two parents. They can do all this remotely. It doesn't matter. Parents, children, everybody can be a half a world away, and it doesn't matter. Apparently, that has not stopped them from proceeding in that case. Well, I don't know. I'm not sure why the appeal is taking as long as it is, or why. The appeal itself hasn't been pending that long. It's just that all of this happened very quickly, and we're on an expedited appeal here, of course. I do want to touch on the wrongful conduct and the agreement that the wrongful conduct in this case happened on March 2nd, 2022. That is the operative moment for the well-settled defense. Under that and governing case law, I think that means that the district court should have considered evidence of well-settled. Not binding, but should have considered that evidence. In other words, you can't. It's an unwaivable defense. Is that your view? You can wait until the last second. Wait until trial starts. No. And then launch it, and the court, nonetheless, has to consider it. I think forfeiture is the issue, and it is possible to forfeit something, of course. It falls within the discretion. So you're saying that it could have been. You're just saying it wasn't. It wasn't here because there was no prejudice, and under the circumstances of this process, that there was sufficient notice and sufficient time to allow for that kind of evidence to be considered. Which brings me to the final point, which is whether a parent's actions were wrong, and there are a lot of very ugly accusations on both sides. A lot of what's in the record is from the father's side, but it is a very contentious family situation. At the end of the day, under the Hay Convention and under this particular defense in particular, the kids are supposed to come first. The point is to protect the kids from being uprooted from stable environments. They don't have that stable environment in their home country right now. That's not the only point, as the Supreme Court said in Lozano, right, that the relationships between the countries are. Fair enough. Respect for each other's. Right, right, and that's why we don't look into and look behind much about what's going on. I have an obligation to return the children to the place of admission in residence. Yes, yes, and whether that's not possible here or there has been a delay for any reason, and the children, regardless of what the parents did and whether what they did was right or wrong, the children being in an environment is a consideration that should be taken into account in deciding. After a year. If the petition is delayed by a year, then the children should, their settlement is a possible consideration in determining whether or not to send them somewhere else during the pendency of the custodial proceedings. And in this case, we think that had the district court allowed evidence of their settlement in New York, and some of that was before the district court, that that consideration should have weighed heavily in the decision on where the children should be during this interim period. But if this got litigated on the merits, wouldn't the relevant date be when Mr. Tereschenko learned that the kids were in the United States? No, it's from the date of wrongful removal or retention, which is March 2nd in this case. It has nothing to do with his... So it rewards a parent who hides his kids really well for over a year. In Lozano, we're dealing with equitable considerations in the Lozano Supreme Court case where there was a parent that was trying to hide the kids and they couldn't find it, but the rule was no equitable consideration. If it's one year, it's one year. Not one year and six days, one year. That's the rule. All right. Okay, well, thank you. Thank you, everyone. We got our money's worth, I think, but it's obviously an interesting and important case. So that concludes our cases on the argument calendar. We'll reserve decision on this last one as well.